IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action Number 3:09CR249 |
| MELVIN M. TAYLOR, | |
| Defendant. | |

## **MEMORANDUM OPINION**

This matter is before the Court on the defendant's motion to suppress (Docket # 12). For the reasons stated herein, the motion to suppress will be denied.

### **I. FACTS**

On May 1, 2009, Richmond Police Officer Anthony Ratliff ("Ratliff") was on routine patrol when he received a radio call to respond to a four-year-old girl that was found wandering alone near Bainbridge Street in Richmond, Virginia. Bainbridge Street is described as a very busy street, often used by drivers to avoid a parallel street that has more stoplights. Officer Ratliff responded and found the girl sitting in a taxi cab. The cab driver had seen the girl walking up and down the street with no responsible adult nearby. He asked her where she lived, and she took him to her home but, according to the driver, they found no one at home. The cab driver then called the police and had the girl sit in the back seat of his cab until an officer arrived. Officer Ratliff asked the girl to take him to her home. The girl pointed to her home and then led Ratliff across the street to a nearby house located at 2117 Bainbridge Street. The door to the house was open. Ratliff followed the child in the house, and Ratliff began yelling, "Hello!" He continued to yell "hello," downstairs and then as they walked upstairs. As he neared the top of the stairs, Ratliff heard someone say, "Hey, Boo."

Ratliff responded, "Hello, where are you?" and, after the man responded that he was in the back room, Ratliff and the girl walked to the back bedroom. There he found the defendant, identity unknown at that time, lying on the bed in the back bedroom. Ratliff told the man that the child was found wandering outside near the street and that she had stated that no one was at home. Ratliff asked the man if he knew the child, and the man said that she was his daughter. The man said he was asleep and that he thought the child had gone to daycare.[1] The man seemed angry with the child. Ratliff noticed several bullets in a plastic baggie in plain view on the bedside table. They appeared to be .22 caliber bullets. Ratliff asked if there was a gun, and the man said no, but that his girlfriend was from the country and had a rifle there. Ratliff asked the man if he had identification, but the man stated that he did not. In response to Ratliff's next questions, the man stated that his name was Anthony Jackson, that his birthdate was February 14, 1988, that he was 21, and that he did not know his social security number. Ratliff also asked the man if he knew the address where they were, and the man stated that he did not. Ratliff then requested a backup unit, and Officer Boxley soon arrived. Ratliff told Boxley what was going on and pointed out the bullets so Boxley would be aware of those. Ratliff then went to Boxley's vehicle because it was closer than Ratliff's and ran the name Anthony Jackson with a birthdate of February 14, 1988 through several records systems but found no such person. Ratliff went back upstairs and asked the man several more times if he had any identification, but the man stated no. He asked the man if he had ever been ticketed or arrested, and the man said no. Ratliff then performed a protective sweep of the area near where the man was sitting on the bed and located a firearm beneath the mattress where the man had been

---

[1] In the Reporting Officer Narrative, (Docket # 18-3) Ratliff stated that the man said that he thought she went to daycare, but during the evidentiary hearing, Ratliff stated that he could not recall what the man told him as to where the girl was supposed to be.

lying. Ratliff then placed the man in handcuffs.[2]

During this time period, the man had made several attempts to call his girlfriend, who he stated was in class. He also called someone he stated was the child's grandmother to tell her what was happening. Ratliff asked the man if the child had a birth certificate and the man told him it was in the closet and let Ratliff search the closet for the birth certificate. The birth certificate was the child's but did not have the man's name listed.

Ratliff asked the man if he could use the man's phone to call the grandmother, and the man agreed. When Ratliff asked the grandmother for the man's name, the grandmother stated that she knew him as "Mikey." While on the phone with the grandmother, the phone began beeping, indicating that another call was coming in, and the name associated with the call on the caller ID was "Baby's Mama." Ratliff assumed that this was the child's mother and answered this call. Ratliff explained what was going on to the person on the phone, and she stated at first that she knew the man only as "Mikey." Ratliff questioned how she could live with and have a child with a man without knowing his real name, and she then gave the name Orlando Taylor. Ratliff asked the man if he was Orlando Taylor, and the man said "No, but he's like a brother to me." Ratliff then went back to the police car and ran a records check for the name Orlando Taylor. The picture that came up did not look like the man he was trying to identify, so he ran the "AKA" listed under the name Orlando Taylor, which was Melvin Michael Taylor, and that photo appeared to match the man in the house. Ratliff found two warrants on file for Taylor's arrest, and he also verified that Melvin

---

[2]Ratliff acknowledged in his testimony during the evidentiary hearing that several sentences in the Reporting Officer Narrative ("RON") are out of order because the RON states that Ratliff placed the defendant in handcuffs and then did the protective sweep of the area, finding the firearm.

Michael Taylor had two felony convictions. Ratliff and Officer Wade, a third officer who had arrived, went back inside, and Ratliff verified that the man was in fact Melvin Michael Taylor. Ratliff arrested Taylor for felon in possession of a firearm and for providing false information to police. Ratliff confirmed that the girlfriend, Tequia Lee, who had arrived by now, was the child's mother. The child told Ratliff that her parents often left her at home alone.

## II. ANALYSIS

A. Standing

To challenge a search successfully under the Fourth Amendment, a defendant must have "a reasonable expectation of privacy" in the place that was searched. *Rakas v. Illinois*, 439 U.S. 128, 152 (1978). A person "may have a legitimate expectation of privacy in the house of someone else." *Minnesota v. Carter*, 515 U.S. 83, 89 (1998). The government initially argued that the defendant lacked standing to challenge the search, but after questioning Tequia Lee, the child's mother, regarding the defendant's relationship to the house at 2117 Bainbridge Street, the government withdrew that argument during the evidentiary hearing. Accordingly, the Court will assume *arguendo* that the defendant, who stayed regularly at the house at 2117 Bainbridge Street, has standing to challenge the entry and subsequent protective sweep.

B. The Fourth Amendment Reasonableness Inquiry

The Fourth Amendment protects persons from unreasonable searches and seizures. *See* U.S. Const. amend. IV. Because "physical entry of the home is the chief evil against which the . . . Fourth Amendment is directed," *Hunsberger v. Wood*, 570 F.3d 546, 553 (4th Cir. 2009) (internal citations omitted), "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (internal citations omitted).

As the United States Court of Appeals for the Fourth Circuit notes, however, "this presumption can be overcome." *Id.* "'[B]ecause the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.'" *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). As in *Hunsberger,* two exceptions are relevant in this case: (1) a warrantless search while a police officer is performing "community caretaking functions," *id.* (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)), and (2) a warrantless search if, in an emergency, "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (internal citations omitted). In this case, the government, which bears the burden of overcoming the presumption of unreasonableness, argues that both exceptions apply.

According to the Fourth Circuit, a community caretaking function is one "totally divorced from the detection, investigation, or acquisition of evidence relating to a violation of a criminal statute." *Id.* (quoting *Dombrowski,* 413 U.S. at 441). This exception requires the court to look at the *function* performed by a police officer. It applies when officers are serving as "community caretakers," protecting the safety of persons or property. *United States v. Gillespie*, 332 F.Supp.2d 923, 929 (W.D. Va. 2004). Some examples include locating weapons in towed vehicles, such as in *Dombrowski*, and other functions typically related to motor vehicles and safety. As described in *Gillespie*, "in *United States v. Gwinn*, when recognizing a kind of community caretaking exception, the Fourth Circuit emphasized that an essential premise of its holding 'is the fact that nothing in the record suggests that [the officer's] reason for the reentry was pretextual or that he acted in bad faith.'" *Id.* (quoting *United States v. Gwinn*, 219 F.3d 326, 335 (4th Cir. 2000)). The Fourth Circuit has noted, most recently in *Hunsberger*, that some courts have relied on the community caretaking

rationale in upholding warrantless searches of homes. 570 F.3d at 553 (noting two circuits holding that the exception applies only to automobile searches, but three others holding that it applies to the warrantless searches of homes).

In the first of the three, *United States v. Rohrig*, 98 F.3d 1506, 1521 (6th Cir. 1996), the Sixth Circuit addresses the "community caretaking functions" exception, noting that "nothing in the Fourth Amendment requires us to set aside our common sense" and declining to read the Fourth Amendment's "'reasonableness' and warrant requirements as authorizing timely governmental responses only in cases involving life-threatening danger." In *Rohrig*, which began with a neighbor's complaint of loud noise and resulted in charges related to marijuana and a sawed-off shotgun, the Sixth Circuit also noted that the officers entered the home "to vindicate a compelling governmental interest" and that "life-or-death" circumstances were not required. *Id.* at 1522. It also noted that the court must "balance the governmental interest being served against the individual's interest in remaining free from governmental intrusions," and that the individual's conduct that has called the governmental interest into question can be considered. *Id.* The Sixth Circuit also found it significant that the officers were motivated to enter the house by an "important community caretaking interest," and were not engaged in the "often competitive enterprise of ferreting out crime" so "there is less cause for concern that they might have rashly made an improper decision." *Id.* at 1523.

In *United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006), a case in which a deputy entered a home because he reasonably believed that the person inside could not respond to his calls, the Eighth Circuit also noted "that there is a difference between the standards that apply when an officer makes a warrantless entry when acting as a so-called community caretaker and when he or

she makes a warrantless entry to investigate a crime." It describes the community caretaking activities as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law," also citing *Dombrowski*, undertaken to help those in danger and to protect property, and unrelated to the officer's duty to investigate crime. The Eighth Circuit also notes that "[t]he Supreme Court has held that reasonable belief, the standard used when determining whether an officer may enter as a community caretaker, is a less exacting standard than probable cause." *Id.* (citing *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978) and *Maryland v. Buie*, 494 U.S. 325, 336-37 (1990)). The Eighth Circuit also notes that when an "entry is justified by probable cause to believe that a violation of the law has occurred or is occurring, . . . the subjective intent of the officer is immaterial." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 813 (1996), and clarifying the two standards.)

In *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005), the Ninth Circuit examined what it refers to as "the emergency doctrine," which "is based on and justified by the fact that, in addition to their role as criminal investigators and law enforcers, the police also function as community caretakers." It also requires that the police "have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property," that "[t]he search must not be primarily motivated by intent to arrest and seize evidence," and that "[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Id.* at 1073-74.

In *United States v. Davis*, 2007 WL 2301583, *3 (W.D. Va. 2007), the court noted that the community caretaker exception has been applied to homes in cases where "the entry was unrelated to the investigation of a crime." The court also quoted the familiar test from *Dombrowski*: "Under

7

the community caretaker exception, as opposed to the emergency exception, officers may make warrantless searches provided that such searches are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id.* (internal citations omitted).

The second exception discussed in *Hunsberger* is the "exigent circumstances" doctrine. The Fourth Circuit states that "even when not performing a community caretaking function, a police officer may search a home without a warrant if, in an emergency, 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" 570 F.3d at 553 (internal citations omitted). It gives examples such as law enforcement officers in hot pursuit of a suspected felon or entering a dwelling to prevent the imminent destruction of evidence, and firefighters entering a burning building to combat a blaze but remaining to investigate its cause and look for evidence of arson.

Examining the two exceptions, the Fourth Circuit notes that the "doctrines overlap conceptually," but "have different 'intellectual underpinning[s],'" and "the two exceptions are not the same." *Id.* at 554. "The community caretaking doctrine requires a court to look at the *function* performed by a police officer, while the emergency exception requires an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed." *Id.* (emphasis in original). The Fourth Circuit explains further:

> We think the best reading of the relationship between the two exceptions is that when analyzing a search made as the result of a routine police procedure, such as the policy of locating weapons in towed cars in *Dombrowski*, the court should examine the programmatic purpose of the policy – whether it was animated by community caretaking considerations or by law enforcement concerns. But when the search in question was performed by a law enforcement officer responding to an emergency, and not as part of a standardized procedure, the exigent circumstances analysis and its objective standard should apply.

*Id.* In the *Hunsberger* case, the Court determined that neither party "has suggested that [the officer], when he entered the Hunsberger home, was following a standard policy that could be classified as community caretaking under the analysis above." *Id.* The factual scenario in *Hunsberger* involved an officer who entered a home at night after responding to a neighbor's second 911 call regarding possible vandalism or burglary, after ringing the doorbell twenty-five or more times with no answer, the lights having been turned off when the officers approached the home, and being aware of a minor girl who was missing. Given this scenario, which it analyzed pursuant to *United States v. Moss*, 963 F.2d 673 (4th Cir. 1992), the Fourth Circuit held that the officer's actions were reasonable and that he did not violate the Fourth Amendment. *Id.* at 557. The court described the inquiry as "whether the circumstances known to [the officer] would create an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *Id.* at 555 (quoting *Moss*, 963 F.2d at 678.).

In the present case, the defense argues that the case should be analyzed under exigent circumstances, and not the community caretaker exception. It argues that the government must establish both that Ratliff had probable cause to believe that what he searched for would be in the house and that there were exigent circumstances – a compelling need for official action and no time to secure a warrant. It cites *United States v. Moses*, 540 F.3d 263, 270 (4th Cir. 2008) in support of its position. In *Moses,* the Fourth Circuit set forth five factors – described as a nonexhaustive list – for the district court to consider in determining whether exigent circumstances are present: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officer's reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are

aware that the police are on their trail; and (5) the ready destructibility of the contraband.  The defense argues, in this case, that the degree of urgency was minimal; that Ratliff had time to get a warrant prior to entering the home; that the child was not injured or in any imminent danger; that Ratliff had no reason to believe that contraband would be removed or destroyed – in fact, he was not even responding to a call about contraband; that he did not have reason to believe that anyone was at the residence to destroy any evidence; that Ratliff had no reason to believe that he was in danger; and that there was no reason to believe that anyone would be found in the house.

Given the circumstances Officer Ratliff faced, the Court finds that the factors set forth in *Moses* are inapplicable. *Moses* was a case where law enforcement officers were investigating crimes – drug trafficking, shootings, and other violent crimes – and attempting to acquire evidence related to those crimes.  After watching activity at a residence where it was suspected drugs and firearms were hidden and arresting a suspect who left that residence, the officers entered the residence to determine that no one was present and then secured the residence until a search warrant could be obtained.  In such a case, the issues were (1) whether probable cause existed to believe that contraband would be found inside the home and (2) whether exigent circumstances existed at the time of entry to permit the warrantless entry.  In such a factual scenario, the non-exhaustive list of five factors would be applicable.  But the circumstances Officer Ratliff faced were completely different.  He was not investigating a crime or attempting to acquire evidence related to a crime.  He was not seeking contraband.  Therefore, the *Moses* analysis does not apply.

The defense also argues that the community caretaker exception does not apply because (1) the Fourth Circuit has never explicitly endorsed application of this doctrine to warrantless home entries and has acknowledged that several circuits have refused to do so; and (2) the circuits that

apply this exception still involve situations where there were "reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." *Stafford,* 416 F.3d at 1074. Here, the defense argues, the child was outside, there was no evidence that anyone inside needed assistance, there was no emergency and, therefore, the entry and search were unlawful.

According to the Fourth Circuit in *Hunsberger*, the district court must first determine if the search in question was "made as the result of a routine police procedure" or "was performed by a law enforcement officer responding to an emergency." Even this determination is not simple. Officer Ratliff responded to an emergency of sorts – a lost four-year-old child wandering a busy street – but the entry by Ratliff into the residence was made as the result of a routine police procedure to attempt to locate the parent or guardian of a lost child.[3] In our case, the emergency of sorts was not a "life-or-death" emergency at that point, given that the cab driver had secured the child. The officer was not engaged in a function related to the "detection, investigation or acquisition of evidence relating to the violation of a criminal statute." Instead, he was attempting to locate the parent or guardian of the lost child and return the child to a safe environment. He started with what the child could tell him – where she lived. She pointed and took him across the street to the house at 2117 Bainbridge Street. She entered the open door, and Ratliff followed her in, calling "hello" throughout the house. The "programmatic purpose of the policy" – the policy

---

[3] In *Dombrowski*, which is a seminal Supreme Court decision involving the community caretaking exception, there was an initial response to an emergency call about a car accident. Later, after the car was towed, the officers searched the car belonging to a police officer, following "routine police procedure" to locate all weapons in towed vehicles for the protection of the general public, believing that Chicago police officers carried their service revolvers with them at all times.

of returning lost children to their parent or guardian – "was animated by community caretaking considerations" rather than "law enforcement concerns." Thus, the Court finds that the community caretaking exception applies to the actions of Officer Ratliff.

Applying the community caretaking exception, the Court finds that the officer's entry into the home was unrelated to the detection, investigation, or attempt to acquire evidence of a crime. As required by the Fourth Circuit in *Gwinn*, nothing in the record suggests that Officer Ratliff's reason for the entry was pretextual or that he acted in bad faith. Applying the Sixth Circuit's *Rohrig* factors, it is clear that Officer Ratliff entered the home "to vindicate a compelling government interest" – that of caring for lost children and returning them to their parent or guardian in a safe environment – and that this is what motivated the officer, rather than a criminal investigation. "Life-or-death" circumstances did not exist, but they are not required. An officer is not expected to leave his common sense at home. He was looking for the child's parent or guardian, and the logical place to begin was at her home, especially given her age and the fact that she was found wandering outside not too far from her home. The Sixth Circuit's analysis balances the governmental interest being served – caring for and returning lost children to their parent or guardian in a safe environment – against the individual's interest in remaining free from governmental intrusions, and notes that the individual's conduct that has called the governmental interest into question can be considered – in this case, the defendant's apparent failure to properly care for and supervise the four-year-old child is what called the governmental interest into question in this case. Further, when Ratliff entered the house he was not engaged in the "enterprise of ferreting out crime."

Applying the Ninth Circuit's test to our factual scenario, Officer Ratliff had reasonable grounds to believe that there was an immediate need for his assistance to protect the safety of a four-

year-old child found wandering alone next to a busy city street, his entry into the house was not motivated by an intent to arrest or seize evidence but only to locate an adult who was responsible for the child, and the child led him to her home, creating a reasonable basis for him to associate the emergency of a lost child with the house at 2117 Bainbridge Street. If a responsible adult had responded to Ratliff's initial calls of "hello" and had provided identification demonstrating that he or she was the child's parent or guardian, that would have been the end of it. Indeed, when Ms. Lee arrived and Ratliff was able to determine that she was the child's mother, he left the child with her. Ratliff's entry into the house was limited to calling "hello" and trying to locate an adult responsible for the child. Thus, the Court finds that under the community caretaking exception, Officer Ratliff's entry into the house was reasonable and there was no violation of the Fourth Amendment.

Under the exigent circumstances doctrine, the Fourth Circuit has stated that the inquiry is "whether the circumstances known to [the officer] would create an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" *Hunsberger*, 570 F.3d at 555. The defendant argues that the degree of urgency was minimal and that Ratliff had time to secure a warrant prior to entering the home. However, Ratliff was attempting only to return a lost child to a responsible parent or guardian within a safe environment. He did not seek a search warrant as he did not intend to search the house. He was not investigating a crime. He wanted only to locate a responsible parent or guardian and return the child. For all he knew as he headed toward the house with the child, a responsible parent or guardian was, at that very moment, looking for the child in the house or nearby the house. The other possibility was that the parent or guardian was in need of assistance, perhaps unable to call out or move, which would also explain the child's being alone outside of her home. The Court finds that

13

the objective circumstances at the time of Ratliff's entry with the child into the house would cause a reasonable officer to believe that there was an emergency requiring prompt entry. A four-year-old child was wandering alone near a busy street. Under no circumstances should a four-year-old child be left alone at home, so the officer knew that there should be someone at home with the child. The cab driver told the officer that the door was open and that he had yelled inside but got no response. These circumstances gave rise to an objectively reasonable belief that something might be awry in the child's home or with the child's parent or guardian, requiring that the officer enter the home. Under this exception, the entry into the house was reasonable and there was no violation of the Fourth Amendment.

The defense suggests that the officer should have pursued what it refers to as "less intrusive alternatives" such as phoning the residence or otherwise attempting to contact the child's parents or guardians. In *Dombrowski*, the Supreme Court stated, "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." 413 U.S. at 447. *See also Hunsberger*, 570 F.3d at 556 (quoting *Dombrowski* and noting that requiring such alternatives would "put too great a burden on officers tasked with responding to emergencies."). In our case, there is no evidence that the child knew her telephone number, assuming there was a land line in the house, or that she knew any of the applicable cellular telephone numbers that belonged to the defendant, Ms. Lee, or the child's grandmother. Common sense dictated that the officer first check the residence to attempt to locate and determine the status of a parent or guardian.

The defense argues that the protective sweep that resulted in the officer finding the weapon was also unlawful. It argues that the actions of the officer were more than a protective sweep,

which is generally a cursory visual inspection of those places in which a person might be hiding or a weapon might be hidden. The government argues that the Fourth Amendment was not violated based on Ratliff's limited search of the area within the defendant's immediate control because Ratliff possessed a reasonable belief based on specific and articulable facts that the area searched harbored a potential danger to those at the scene. In trying to determine if the man was a parent or guardian of the child, Ratliff had asked the man for his identification. The man stated that he had no identification, that he did not know his social security number, and that he did not know the address of the house where they were. At this point, given the circumstances, including the four-year-old child found wandering along a busy street, the man's lack of identification and his other answers, his obvious anger with regard to the child, and the bullets in plain view and within the defendant's reach, Ratliff had reasonable articulable suspicion that a crime may have been committed. Ratliff then asked for assistance from another unit. After the second officer arrived, Ratliff tried to verify the man's identity but was unable to do so because the man gave him a false name and birthdate. Thereafter, Ratliff's reasonable suspicion that the defendant had committed the offense of providing false information to the authorities and possibly other offenses moved to the level of probable cause to arrest, and Ratliff also remained aware of the fact that the defendant had bullets within his reach. For officer safety and the safety of the child, Ratliff then conducted a limited search of the area within the defendant's "immediate control" – the area from within which the defendant might gain possession of a weapon. Ratliff lifted the mattress on the bed on which the defendant was located and found the weapon. He then handcuffed the defendant. Upon Ratliff's determination of the defendant's true identity, the defendant was arrested and charged with felon in possession of a firearm and for providing false information to police. The Court finds that under

*Maryland v. Buie*, 494 U.S. 325 (1990) and *Chimel v. Califormia*, 395 U.S. 752 (1969), and their progeny, and the totality of the circumstances at the time Ratliff conducted the search, Ratliff's limited search of the area within the defendant's immediate control, including under the mattress, did not violate the Fourth Amendment.

### III. CONCLUSION

The Court concludes that the entry and subsequent limited search were lawful under the Fourth Amendment. Accordingly, defendant's motion to suppress will be denied.

An appropriate Order shall issue.

October 14, 2009                                   /s/
DATE                                               RICHARD L. WILLIAMS
                                                   SENIOR UNITED STATES DISTRICT JUDGE